IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS J. TURNER,            )
                             )
            Plaintiff,       )
                             )
    v.                       )    No. 05 C 4203
                             )
SWISSPORT CARGO SERVICE, INC.,)
                             )
            Defendant.       )

## MEMORANDUM OPINION AND ORDER

Dennis Turner ("Turner") has brought a three-count Complaint against his former employer, Swissport Cargo Services, LP[1] ("Swissport"), asserting that he was discriminated against on the basis of his race and national origin. Turner charges violations of both Title VII of the Civil Rights Act of 1991 ("Title VII," 42 U.S.C. §§2000e to 2000e-17)[2] and Section 1981.

Swissport has moved for summary judgment on all of Turner's claims under Fed. R. Civ. P. ("Rule") 56, and its motion has been fully briefed by the parties. For the reasons stated in this memorandum opinion and order, Swissport's motion is granted in its entirety.

## Summary Judgment Standard

Well-established Rule 56 principles impose on Swissport the burden of establishing the lack of a genuine issue of material

---

[1] Swissport Cargo Services, LP was incorrectly identified as Swissport Cargo Service in the Complaint.

[2] All further references to Title 42's provisions will simply take the form "Section--."

fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must consider the evidentiary record in the light most favorable to nonmovant Turner and must draw all reasonable inferences in his favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment, Turner must produce "more than a mere scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). If the record reveals that no reasonable jury could find in favor of Turner, summary judgment must be granted (see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

To evaluate that possibility, what follows is a summary of the facts, viewed of course in the light most favorable to nonmovant Turner under the criteria prescribed by Rule 56 and this District Court's LR 56.1.[3] And that of course obviates the

---

[3] LR 56.1 implements Rule 56 by requiring the submission of evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion cites to Swissport's statement as "S. St. ¶--" and to Turner's response as "T. St. ¶--." Where an S. St. assertion is undisputed by Turner, this opinion includes only the S. St. citation. "T." and "S." designations are also used in referring to all other documents submitted by the parties. Finally, for simplicity's sake citations to witness depositions (including Turner's) will abbreviate the names--"T." for Turner, "M." for Matusik, "B." for Bravo, "C," for Clemente, "D." for Diaz and "P." for Poedtke--followed by "Dep."

need to repeat "according to Turner" or the like, or to identify any conflicting account, though a conflicting version is sometimes included for purely informational purposes.

Background

Turner is an African American male formerly employed by Swissport, a dedicated air cargo ground services company (S. St. ¶9). Swissport's mail operations include areas where its employees (known as "mail agents") alternatively unload, encode and sort mail according to its final destination (id. ¶9). Turner worked part-time as a lead mail agent, a position that included all the responsibilities of the mail agents plus the added responsibility of ensuring that employees were in their assigned work areas, enforcing orderly operations, proposing improvements in work methods, providing coaching and individual on-the-job training of other mail agents and providing support for warehouse cargo agents (S. St. ¶¶11, 82-3). As a lead mail agent Turner could not hire or fire other employees, nor could he resolve, without the assistance of a supervisor, conflicts that arose between himself and other employees (T. Dep. 83-84, 118-20).

For the relevant time period, Swissport's mail department leadership consisted of Frank Clemente ("Clemente") as the cargo manager (C. Dep. 5), Mark Poedtke ("Poedtke") as the operations manager (id. 18) and Sigmund Matusik ("Matusik") as the full-time

supervisor (M. Dep. 7). During his tenure as a lead mail agent Turner was primarily supervised by Matusik, Francisco Bravo ("Bravo") and Juan Miramontes ("Miramontes")(T. Dep. 72-73). Assignments within Swissport's operations were not fixed: All mail agents were assigned to areas based on the organization's operational needs, and lead agents as well as supervisors were expected to jump in and assist in the various work areas as needed (C. Dep. 34, 45). Turner was aware that as a lead mail agent he was expected to work in any position in the Swissport mail facility (S. St. ¶32).

Events giving rise to Turner's claims occurred in September and October 2004, when he was primarily working in the mail encoding area, a position that required him to lead up to eight employees, most being Hispanic females, some of whom spoke English and others of whom did not (T. Dep. 44, 275). On September 28, during a shift meeting with his supervisors, Turner reported having an issue with Teresa Blanco ("Blanco"), a Hispanic employee who persisted in turning off the encoding machine in violation of Turner's specific request that she leave the machine running (id. 122-23, 125). In response to Turner's report, his duty manager told him that he could send Blanco home if she continued to turn off the encoding machine (id. 120). Matusik, however, overrode Turner's duty manager and ultimately said that Turner could not send her home (id. 120).

4

On the following work day Turner had an altercation with Lisa Diaz ("Diaz"), a fellow lead agent (T. Dep. 139). Diaz called Turner and asked him to come to her work area for a discussion, but when he arrived Diaz was speaking in Spanish to another worker, Olympia Placencia ("Placencia")(id. 141-42). Turner interrupted several times, asking Diaz to speak English so he could understand what was being said, but Diaz refused (she later claimed that was because she was trying to translate Placencia's words from Spanish to English)(S. St. ¶36; D. Dep. 42). After Turner persisted in his requests that Diaz speak English, she reacted angrily by telling Turner to shut up and by cursing at him (T. Dep. 143). As the interaction escalated, Diaz became so enraged that she attempted to strike Turner, but she was restrained by Bravo (id.; D. Dep. 43). When tempers subsided Turner, Diaz and Bravo each had an opportunity to tell his or her version of the story at a meeting with supervisors Matusik and Poedtke (T. Dep. 144). During that meeting Diaz told the supervisors that the conflict erupted because Placencia had asked Diaz to intervene on her behalf when Turner refused to let Placencia use the washroom (M. Dep. 38-39), a claim that Turner denies (T. Dep. 146).[4]

As a result of the altercation Diaz was suspended without

---

[4] As indicated earlier, Turner's version is credited on the current motion.

5

pay for three days for cursing at and attempting to strike Turner (S. St. Ex. P), and Turner was reassigned from the encoding area to the G chute (M. Dep. 32). Turner was upset about his reassignment to the G chute--he viewed the transfer from encoding to the G chute as punishment and a demotion (S. St. Ex. P; T. Mem. 7). For his part, Matusik says he had decided to move Turner to the G chute because the communication problem caused by the Spanish language barrier convinced him that "it would be easier just to have [Turner] work in a different area and the best at that time was the G aisle" (M. Dep. 31). Diaz was contemporaneously reassigned as the lead cargo agent in the encoding area because her Spanish-speaking skills alleviated the "communication gap" between Spanish and non-Spanish speakers that had caused so much friction between Turner and Blanco, Diaz and Placencia (id. 33).

Turner testified expressly that he understood his race was not a motivating factor in his transfer from encoding to the G chute. Instead he believes he was transferred because he did not speak Spanish (T. Dep. 275) and that was why he was replaced in encoding by Spanish-speaker Diaz (id. 144). Neither Turner's title nor his pay rate was affected when he was reassigned from the encoding area to the G chute (id. 256).

Upon reporting for his first day of duty at the G chute on October 5, Turner endured what he believes was retaliation and

6

harassment (T. St. ¶48).  During that first shift Matusik tried to call Turner twice on the radio, but both times Turner had stepped away from the area and missed the calls (T. Dep. 244-45).

Because Matusik called him right after he had stepped away from the work floor, Turner believes that supervisor Miramontes, along with employees Diaz and Keith Mori ("Mori"), were spying on him in order to report his absences to Matusik (id. 245-46), but he cites no evidence to support that.  Turner testified that when he and Matusik finally spoke, Matusik explained the reason for his calls:  "Both times he said that I shouldn't be leaving Art by himself because he needed help and he said I need to stay in the area and that I know better" (id. 237).  Matusik told Turner he should either stay in the area to help the other employee or go home (id. 237).

On October 12 Turner notified Swissport via letter that he was resigning his position as lead mail agent effective October 21 due to "discrimination, harassment and unfairness in the workplace" (S. St. ¶60).  Turner worked two additional shifts at Swissport on October 14 and 15 (id. ¶58).  Turner later filed a charge of discrimination with the Equal Opportunity Employment Commission, asserting that Swissport had discriminated against him on the basis of race and national origin (Complaint ¶6). Upon receiving his right to sue letter, Turner filed his timely Complaint here on July 21, 2005.

7

## Race and National Origin Discrimination

It is well known that there are two routes by which a plaintiff may prevail in an employment discrimination suit: the direct and indirect methods. Under the direct method Turner must prove, essentially through an admission or other circumstantial evidence from Swissport, that Swissport took an adverse employment action against him because of his race or national origin (Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006)). Alternatively he may proceed under the indirect burden-shifting method memorialized in the seminal McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) decision.

Raymond, 442 F.3d at 610 sets out the four elements to Turner's prima facie case under the latter method:

> (1) [he] is a member of a protected class; (2) [he] was performing at a level that met [his] employer's legitimate expectations; (3) [he] was subject to an adverse employment action; and (4) [he] was treated differently than a similarly situated person outside [his] protected classes.

Once Turner has made such a showing,[5] the burden shifts to

---

[5] In the summary judgment context, of course, Turner's burden is only one of demonstrating the existence of genuine issues of material fact, not one of proof as such (see Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what a party responding to a Rule 56 motion must "establish" or "prove" or "show." Whenever this opinion employs such terms, it should therefore be understood as denoting only Turner's lesser burden described in this footnote, not the actual burden of persuasion.

Swissport to "articulate some legitimate, nondiscriminatory reason" for Turner's adverse employment action (id., quoting McDonnell Douglas, 411 U.S. at 802). If Swissport does so, Turner must then show that the proffered reason is pretextual. In all events Turner as plaintiff bears the burden of proof (as contrasted with the shifting burdens of production).

Though his argument is difficult to follow, Turner appears to assert that there is direct evidence that Swissport acted adversely against him because of his race and national origin. But what follows that assertion in Turner's submissions is not any direct evidence that Swissport discriminated against him on an impermissible basis of his race or national origin, but rather a recitation of facts that do not themselves suggest discrimination. Lacking such direct or "smoking gun" evidence of discrimination, Turner "must proceed under the burden shifting method of proof and hope for an inference of discriminatory intent to arise from his prima facie case and his attack on [Swissport's] reason for [transferring him out of the encoding area]" (McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 372 (7th Cir. 1992), adapted to this case).

As an initial matter, even though Turner's Complaint alleged that Swissport discriminated against him by moving him out of encoding based on his race and national origin, he admitted at T. Dep. 275 that he considered his reassignment to the G chute was

not because of his race:

> Q: Are you claiming that because you were moved out of the encoding area, that is based on your race?
>
> A: No. No. No.

Instead he explained that he understood he was being moved out of encoding because "they wanted someone to speak Spanish" (id.).

Rule 56(e) renders his pleading's racial discrimination claim--disavowed as it was by his own testimony--ineffectual, leaving available to him only his claim of discrimination on the basis of his national origin. But that claim is potentially problematic, for it conflates language with national origin--that is, his actual complaint is that Swissport reassigned him from the encoding area to the G chute on what he believes is an impermissible basis: his inability to speak Spanish so as to communicate with the myriad Spanish-speaking employees in that area.

While the question "[w]hether classifications on the basis of language are to be treated as classifications on the basis of national origin is an unsettled question" (Kikumura v. Turner, 28 F.3d 592, 599 (7th Cir. 1994)), it is also true that "with the increased understanding of the necessity of cultural tolerance, the courts and Congress have been careful to protect the more populous language minorities from the majority" (Smothers v. Benitez, 806 F.Supp. 299, 305 (D. P.R. 1992)). Not only was Turner in the language majority rather than the minority, but he

10

has also not adequately connected his lack of language skills to his national origin.

In fact, Swissport's interest in staffing a Spanish speaker was to effect its goal of smooth and orderly operations in the encoding area. Turner admitted that he was moved from encoding because he "was told they wanted someone to speak Spanish" (T. Dep. 275). To that end Swissport could have put a lead mail agent of any race in encoding, so long as he or she spoke Spanish. On that score Turner admitted that there was a "language barrier" and that he was "not able to communicate with Hispanic" workers (T. Dep. 180). Hence Turner's transfer because he lacked Spanish-speaking skills need not be viewed as a function of his national origin.[6]

But suppose it were to be assumed arguendo--by drawing all pro-Turner inferences--that Turner's English-only language skills were to be limited to his national origin. Even so, Turner still

---

[6] In that respect it is surely relevant that factors such as (but in all likelihood not limited to) the ongoing substantial increase in the percentage of persons of Hispanic origin in the United States have led to a major increase in the choice of Spanish as the preferred foreign language in the public school system--a choice not at all limited to persons of Hispanic origin. As reported in More College Students Studying Foreign Languages Than Ever Before, Modern Language Ass'n of Am. (fall 2002), available at http://www.eastasia.org/MLA%202002%20stats.pdf):

> Since 1970 Spanish has been the most widely taught language in colleges and universities, accounting for more than half (53%) of the total foreign language enrollments in 2002.

cannot defeat Swissport's summary judgment motion because he has not suffered an actionable adverse employment action. To meet that burden Turner must demonstrate more than "mere unhappiness and inconvenience" (Haywood v. Lucent Techs., Inc., 323 F.3d 524, 532 (7th Cir. 2003)). Instead Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004), quoting Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 133, 136 (7th Cir. 1993), emphasizes that a "materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" And Rhodes, 359 F.3d at 504 then goes on to describe the burden plaintiffs such as Turner must meet to demonstrate an adverse employment action:

> For purposes of Title VII, an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits.

Put another way, plaintiffs in Turner's position must show that the action taken by their employers materially affected their employment conditions in a way that caused a "severe or pervasive" change in their daily conditions of employment (Onacle v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998)). Hence not all actions that an employee finds disagreeable are actionable, a corollary further illustrated by Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 660 (7th Cir.2005):

> Even in an all-white, all-male labor force where all

12

workers share one religious faith, everyone feels put
upon or slighted occasionally; if these cannot be
attributed to discrimination, neither can most of the
other disappointments people encounter at work.

Turner has failed to show his transfer from the encoding department to the G chute meets the Rhodes-Washington standard. Indeed, speaking specifically about a lateral transfer decision, Washington, 420 F.3d at 661 reminds us "that a lateral transfer that does not affect pay (or significantly affect working conditions) cannot be called discriminatory" because "[s]uch changes...do not hurt the pocketbook."

In this instance Turner was still engaged in employee management while working at the G chute. Although he managed two employees in that new assignment, in comparison with six to eight employees in his earlier position, the new assignment carried no other indicia of adverse consequences. When Turner reported to the G chute, he was "told to just...be a lead" and to ensure that when the mail chute was full, his staff properly pulled it out (T. Dep. 222). Most importantly, neither Turner's pay nor his title changed. And Turner has acknowledged that as a lead mail agent he could be moved among various different positions within the facility.

In sum, Turner has failed to produce evidence--as is required by Whittaker v. N. Ill. Univ., 424 F.3d 640, 648 (7th Cir. 2005)(internal citations omitted)--that he suffered an adverse action that "materially alter[ed] the terms and

13

conditions of employment." That being so, his reassignment to serve as lead mail agent for the G mail chute cannot be labeled, as he would have it, as a "demotion."[7]

Hence Turner has failed to carry his burden of proving one essential element of his prima facie case of discrimination based on national origin. With both facets of Turner's discrimination claim having been dispatched, this Court grants Swissport's motion for summary judgment on that claim.

## Retaliation

Turner has also complained that Swissport retaliated against him "because he opposed unlawful discrimination" (T. Mem. 6)--a claimed violation of Section 2000e-3(a). To that end Turner asserts that after he complained about being moved out of encoding in favor of the belligerent--and Spanish-speaking--Diaz, he was subjected to retaliation in the form of being monitored and singled out for surveillance by Swissport supervisors and fellow employees.

As Mlynczak v. Bodman, 442 F.3d 1050, 1061 (7th Cir. 2006) (brackets in original) has explained, a plaintiff claiming

---

[7] In that regard Turner has also failed to note the substantial contradiction implicit in his contention. If the mail-encoding-to-G-chute switch did constitute a "demotion," as Turner argues, the reverse of that switch would necessarily be a promotion. Under Turner's theory, then, Diaz simultaneously received a three-day suspension for misconduct and the reward of a "promotion." That inherent illogic even further undercuts Turner's already unpersuasive position.

14

retaliation can travel either of two routes:

> In order to go forward with their [sic] case, the plaintiff has two options. First, more directly, he may show that (1) he engaged in protected activity and (2) suffered the adverse action in question; or second, he may show that (1) he engaged in the protected activity, (2) afterwards only he, and not any similarly situated employee who did not file a charge [or otherwise engage in protected activity] was subjected to an adverse action, even though (3) he was performing the job satisfactorily.

It is uncontested that Turner engaged in protected activity when he complained about Swissport's allegedly discriminatory practices. This opinion therefore focuses on whether Turner consequently suffered any actionable adverse action.

In that respect Turner views Matusik's several calls to him on his first day on the G chute floor, which he believed were precipitated by the cellular telephone calls from other supervisors and employees spying on him, as acts constituting retaliation. That asserted surveillance and mircromanagement-- with Matusik "[c]onstantly calling [him] on the radio telling [him] to be in [his] work area"--signaled to Turner that he was being harassed for his complaints about racial disparities at Swissport (T. Dep. 242).

Just this past Term the Supreme Court defined the elements of a retaliation claim in Burlington N. & Santa Fe Ry. v. White, 126 S.Ct. 2405 (2006). And as Nair v. Nicholson, 464 F.3d 766, 768 (7th Cir. 2006) has since said, quoting Burlington N., 126 S.Ct. at 2415:

15

> While it is now settled that retaliation to be
> actionable need not take the form of an adverse
> employment action, "petty slights or minor annoyances
> won't do."

Nair, 464 F.3d at 768-69 went on to explain:

> The test is whether the conduct alleged as retaliation
> would be likely to deter a reasonable employee from
> complaining about discrimination.

For that purpose Turner is obligated to prove that Swissport's "motive [was to] retaliate for activity protected by Title VII" (id. at 769 (emphasis in original)).

In those terms it cannot fairly be said, even with the benefit of reasonable pro-Turner inferences, that several phone calls from a supervisor on Turner's first day at his new assignment amount to "severe and pervasive" hostility as called for by Mlynczak, 442 F.3d at 1061. Moreover, Turner admitted that he had earlier stepped away from the area, leaving a single employee to handle the mail (T. Dep. 223). No reasonable jury could find that several calls from a supervisor checking on a potentially understaffed work area amounted to the type of retaliation that would deter others from making complaints, as required by Burlington N. and Nair, 464 F.3d at 768-69.

Turner's retaliation claim has thus suffered the same fate as his discrimination claim. Swissport's summary judgment motion is granted in that respect as well.

## Conclusion

There is no genuine issue of material fact as to either of

16

Turner's claims, and Swissport is entitled to a judgment as a matter of law. Swissport's Rule 56 motion is granted in its entirety, and this action is dismissed with prejudice.

_____
Milton I. Shadur
Senior United States District Judge

Date: December 12, 2006